# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| RONALD WASTEWATER DISTRICT, a Washington municipal corporation, | No. 78516-8-I |
| Respondent, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| OLYMPIC VIEW WATER AND SEWER DISTRICT, a Washington municipal corporation; and TOWN OF WOODWAY, a Washington municipal corporation, | |
| Appellants, | |
| SNOHOMISH COUNTY, a Washington municipal corporation; KING COUNTY, a Washington municipal corporation; and CITY OF SHORELINE, a Washington municipal corporation, | |
| Defendants. | FILED: July 1, 2019 |

APPELWICK, C.J. — In 1985, the King County Superior Court entered an order approving an agreement to transfer a sewerage system from "King County" to Ronald. The order stated that the area served by King County was deemed annexed to Ronald. The description of King County's service area in the agreement included Point Wells, an area in "Snohomish County" located within Olympic's corporate boundaries.

In 2016, Ronald brought a declaratory judgment action, arguing in part that the order annexed Point Wells to Ronald. It then moved for partial summary

judgment on that basis. Snohomish County and Woodway also filed motions for summary judgment, arguing that the Transfer Order did not annex any Snohomish County territory to Ronald. The trial court granted Ronald's motion and denied the Snohomish County and Woodway motions. Olympic and Woodway appeal, arguing that the Transfer Order did not authorize the annexation of Point Wells to Ronald.

We hold that the superior court lacked subject matter jurisdiction to grant an annexation by Ronald of territory within the municipal corporate boundaries of Olympic. We reverse the trial court's grant of partial summary judgment to Ronald, remand for an order granting Woodway's motion for summary judgment in part, and for other proceedings consistent with this opinion.

## FACTS

### The Sewer Districts

In 1937, Olympic View Water District, now known as Olympic View Water and Sewer District, was formed under Title 57 RCW.[1] See former RCW 57.04.020 (LAWS OF 1929, ch. 114, § 1) (authorizing water districts). In 1946, it annexed the southwestern portion of Snohomish County, including Point Wells. Point Wells is an area in Snohomish County consisting of two portions, a low land area along Puget Sound and an upper bluff area above the Burlington Northern Santa Fe

---

[1] See former RCW 57.04.020 (1929) (authorizing water districts). In 1996, the legislature consolidated water and sewer districts into water-sewer districts. LAWS OF 1996, ch. 230, § 101. Combined water-sewer districts are now governed by a revised Title 57 RCW. Landmark Dev., Inc. v. City of Roy, 138 Wn.2d 561, 570 n.1, 980 P.2d 1234 (1999).

railway tracks. Olympic has provided water service there since 1949. In 1966, Olympic began providing sewer service within its corporate boundaries.[2]

Around 1940, Sewerage and Drainage Improvement District No. 3 of King County (KCSD No. 3) formed.[3] KCSD No. 3 operated a sewer system, often referred to as the Richmond Beach sewer system (RBSS). The RBSS encompassed 350 acres in the northwest corner of King County, an area now within Ronald Wastewater District's boundaries.[4] KCSD No. 3 was bounded on the north by Snohomish County, on the east and south by Ronald, and on the west by Puget Sound. KCSD No. 3 dissolved in 1984 upon transferring the RBSS to King County.

In 1951, Ronald formed as a sewer district under Title 56 RCW.[5] See former RCW 56.04.020 (1945) (LAWS OF 1941, ch. 210, §1) (authorizing sewer districts). It is located in the northwest corner of King County, within the cities of Shoreline

---

[2] In 1963, the Washington Legislature enacted a law allowing water districts to establish, maintain, and operate a mutual water and sewer system, or a separate sewer system. LAWS OF 1963, ch. 111, § 1. Pursuant to former RCW 57.08.065 (LAWS OF 1963, ch. 111, § 1 (1963)), Olympic was subject to former Title 56 RCW for purposes of providing sewer services. We treat the issue between Olympic and Ronald as one between two sewer districts.

[3] By a 1940 resolution, the King County Commissioners appointed the county road engineer as supervisor of KCSD No. 3, delegating to him the governing authority for the district under former RCW 85.08.300 (1965). The county road engineer's duties were then assigned in part to the director of the King County Department of Public Works (King County DPW). After that assignment, the county road engineer and the director of King County DPW shared the function of governing KCSD No. 3.

[4] The RBSS was constructed in 1939 and 1940. The record does not indicate, and the parties do not argue, that the RBSS and KCSD No. 3 were separate legal entities. Rather, Olympic and Ronald argue that KCSD No. 3 was formed to operate the RBSS.

[5] See former RCW 56.04.020 (LAWS OF 1945, ch. 140, § 1) (authorizing sewer districts).

and Lake Forest Park. Ronald is bordered on the north by several municipalities, including Olympic.

The Service Extension Agreements

In 1971, KCSD No. 3 entered into a contract with Standard Oil Company of California (Standard) to operate and maintain a sewage lift station Standard installed in Point Wells (Lift Station No. 13).[6] Lift Station No. 13 was located approximately 180 feet north of the King County line, within Olympic's corporate boundaries at the time. Standard built Lift Station No. 13 in order to connect its marine terminal in Point Wells to KCSD No. 3's sewer system. Before entering the contract, Standard agreed it would install an eight inch gravity sewer line and a four inch pressure sewer line from KCSD's existing lift station to Lift Station No. 13. KCSD No. 3 agreed to reimburse Standard for the cost of the gravity sewer line, which would then become KCSD No. 3's property. Title to the pressure sewer line would also pass to KCSD No. 3 upon its installation. In the 1971 contract, Standard granted KCSD No. 3 a right of way and an easement to maintain, operate, repair, replace, and remove Lift Station No. 13.

In a 1971 letter, Seattle's superintendent of water told Olympic that King County DPW had asked the Seattle Water Department to provide water service to Lift Station No. 13, north of the King County line. Because Lift Station No. 13 appeared to be within Olympic's service area, he asked for Olympic's comments regarding King County DPW's request. In response, Olympic stated that it had "no

---

[6] Olympic and Ronald refer to the lift station as Lift Station No. 13 in their briefs.

4

objections to permitting [King County DPW] to serve the lift station located approximately 180 feet north of the King County line on Richmond Beach Drive, within our service area." The parties do not cite to any other correspondence between Olympic and King County regarding KCSD No. 3's service to Lift Station No. 13. There is no indication from the record that Olympic ever consented to KCSD No. 3 extending sewer services into Point Wells.[7]

In 1972, KCSD No. 3 entered into a contract with Daniel Briggs to serve his property in Woodway. The Briggs property "serves into the District's Pump Station No. 13." This area was also located within Olympic's corporate boundaries at the time. There is no indication from the record, and the parties do not argue, that Olympic or Woodway knew about or consented to KCSD No. 3's service to the Briggs property. Ronald does not address the 1972 contract in its brief, and the parties do not provide a citation to the contract in the record.[8]

King County Divests Its Sewer System Operations

In 1982, the King County Council began investigating whether to divest itself of sewer service responsibilities. In 1983, it directed the county executive to begin

---

[7] Ronald argues that Olympic consented to KCSD's extension of sewer service in its 1971 letter stating that it had "no objections to permitting [King County DPW] to serve the lift station." But, Olympic made this statement in response to the Seattle Water Department's letter stating that King County DPW had asked it to provide water service to Lift Station No. 13. The Seattle Water Department's letter did not address sewer service.

[8] In 1988, Ronald entered into another contract with Briggs to provide sewer service to three more lots, "Lots 2, 3, and 4," in his proposed subdivision. The contract noted that "Lot 1" was already served by Ronald pursuant to KCSD No. 3's 1972 contract with Briggs. Under the contract, Ronald agreed that it would "provide interim sanitary sewer service until such time when permanent sanitary sewer service is provided through the Town of Woodway."

negotiations to transfer the operation and responsibility for its sewerage systems. King County sent a request for proposals to Ronald and eight other agencies that "might be interested in assuming responsibility for King County's five sewer utilities." KCSD No. 3 was located immediately adjacent to Ronald's boundary on the west. Ronald's board then voted to send a proposal to acquire KCSD No. 3. The King County Executive's Office and King County DPW found that its proposal[9] was "an acceptable basis" for negotiating the transfer of King County's sewer district responsibilities.

On January 3, 1984, the King County Council passed a motion directing King County DPW to initiate the transfer of the RBSS. It also directed King County DPW to assist in "seek[ing] amendments to [c]hapter 36.94 RCW which provide for divestment of county sewer service responsibilities through petition to Superior Court." In its 1983 sewer divestment implementation report, King County noted that there were no provisions in existing statutes that specifically applied to the facts in its divestment effort. It stated that in order to divest itself of sewer system responsibilities, it would have to "follow statutes written for use by special purpose sewer districts to accomplish annexation of new territory." Specifically, it stated that divestment could be accomplished through the annexation procedures in former chapter 56.24 RCW.

However, King County noted that divestment of its sewer districts under the current statutes involved the risk that the required voter approval would not be

_____

[9] The report referred to Ronald's proposal to acquire KCSD No. 3 as a proposal to assume the "Richmond Beach system."

obtained.[10] As a result, it proposed seeking legislative amendments to chapter 36.94 RCW, which already allowed a municipal corporation to transfer its sewerage system to a county through petition to a superior court, without voter approval. Its proposed amendments would "provide for a similar process of petition to [a superior court] to transfer a county-operated sewer system to another [municipal] corporation." The report ultimately recommended that King County seek these amendments.

On February 28, 1984, the Washington Legislature passed Substitute House Bill 1127 (SHB 1127). SHB 1127 authorized counties to transfer sewerage systems to a water or sewer district "in the same manner as is provided for the transfer of those functions from a water or sewer district to a county in RCW 36.94.310 through 36.94.340." LAWS OF 1984, ch. 147, § 1; see LAWS OF 1984, at 647 (setting out date it passed the House). Under RCW 36.94.310-.340, a county is allowed to acquire all or part of a sewer system from a municipal corporation by agreement. RCW 36.94.310. The authority is limited to acquisition of systems whose territory lies entirely within the county. Id. In lieu of the voter approval required by former Title 56 RCW for transfers of sewer district territory, the agreement was subject to a judicial hearing and notice of that hearing. Former RCW 36.94.340 (LAWS OF 1975, 1st Ex. Sess., ch 188, § 10). SHB 1127 was

---

[10] At the time of the report in November 1983, annexation under former chapter 56.24 RCW required voters residing in the territory to be annexed to approve the annexation through a special election. See former RCW 56.24.080 (LAWS OF 1967, Ex. Sess., ch. 11, §2) (providing for special election).

codified at RCW 36.94.410-.440. LAWS OF 1984, ch. 147. It took effect on June 7, 1984. See LAWS OF 1984, at ii (see 5(a) setting out effective date).

In addition to allowing the county to transfer a system without voter approval, SHB 1127 included an annexation provision. It stated that, if provided in the transfer agreement, "the area served by the [county's] system shall, upon completion of the transfer, be deemed annexed to and become a part of the water or sewer district acquiring the system." LAWS OF 1984, ch. 147, § 2. It required a superior court to direct that the transfer be accomplished in accordance with the agreement if the court finds that the agreement is "legally correct and that the interests of the owners of related indebtedness are protected." Id. at § 4. It also exempted the transaction from boundary review board review. Id. at § 5.

In March 1984, the King County Council adopted a sewerage plan for the "Richmond Beach Sewer Service Area." The plan stated that KCSD No. 3 was "bounded on the north by Snohomish County," that "[n]o expansion of the present system boundary" was anticipated, and that "[s]ervice is also provided to a Chevron Petroleum plant on Point Wells just north of the King-Snohomish County border."[11]

The RBSS was transferred to Ronald in two steps. First, in June 1984, King County and KCSD No. 3 filed a joint petition with the King County Superior Court, seeking approval of the transfer of the RBSS from KCSD No. 3 to King County. The court approved the transfer.[12]

_____

[11] Standard later became Chevron U.S.A., Inc.
[12] The transfer was to be accomplished in accordance with the transfer agreement. King County and KCSD No. 3's transfer agreement provided for the

Second, King County and Ronald entered into an agreement to transfer the RBSS from King County to Ronald, effective January 1, 1986. The agreement stated that "[t]he area served by the System shall be deemed annexed to and a part of the District as of the above-stated effective date." In an addendum describing the "'area served' by the System," King County and Ronald included territory in Snohomish County. Ronald, Olympic, and Woodway agree that the description included Point Wells. The description also included the area in Woodway where the Briggs property is located.

The agreement stated that "the System serves approximately 1,022 customers directly and serves others by developer extension agreements." It incorporated those contracts into the agreement by reference, and assigned all of King County's rights and obligations under those contracts to Ronald. Those contracts included the agreement to operate and maintain Lift Station No. 13 in Point Wells.

King County and Ronald then filed a petition with the King County Superior Court, seeking approval of the transfer agreement pursuant to chapter 36.94 RCW. The court set a November 20, 1985 hearing date, and notice of the hearing was

---

transfer of "all property and other assets from the District to King County." It also provided for the dissolution of KCSD No. 3 upon completion of the transfer. And, it stated, "The District is the owner of a certain sanitary sewer system located within King County. The location, size and other features of the system are specifically described in the February 1984 Richmond Beach Comprehensive Plan; a copy of which is attached hereto as Addendum A." According to that plan, KCSD No. 3 was bounded on the north by Snohomish County, and no expansion of that boundary was anticipated. Thus, KCSD No. 3 did not transfer any Snohomish County territory to King County.

published in The Seattle Times. At the end of the hearing, the court entered an order approving the transfer agreement (Transfer Order).

Events Post Transfer Order

In 1986, King County's Executive sent a letter to Snohomish County's Superintendent of Elections, stating that its transfer of the RBSS to Ronald extended Ronald's boundaries into Snohomish County. In Olympic's 1986 sewer plan, it did not include Point Wells in a map of its sewer service area. And, in Ronald's 1990 and 2001 sewer plans, it did not list any Snohomish County territory in its corporate boundaries.

In 2007, Ronald's board adopted a resolution recognizing that its corporate boundary "includes a portion of unincorporated Snohomish County which area lies north of and adjacent to the City of Shoreline, west of and adjacent to the Town of Woodway, south of and adjacent to the City of Edmonds, and east of and adjacent to Puget Sound." That same year, the Snohomish County Prosecuting Attorney's office sent a memorandum of advice to the county auditor, stating that the portion of Snohomish County described in the transfer agreement was annexed to Ronald. Olympic's 2007 sewer plan recognized that Ronald served Snohomish County territory, but still included that territory within its corporate boundaries. Going forward, Ronald's sewer plan listed Snohomish County territory in its corporate boundaries.

In 2015, Olympic proposed amended its 2007 sewer plan. The amendment involved providing service to a site in Point Wells that was being redeveloped into a mixed use urban center. In the amendment, Olympic stated that Ronald currently

provided sewer service to the industrial facilities in Point Wells and four adjacent homes in Woodway. But, Olympic affirmed that Point Wells was within its corporate boundaries. In 2016, the Snohomish County Council passed Amended Motion No. 16-135, approving the amendment to Olympic's 2007 plan.

Present Action

On July 15, 2016, Ronald filed the current action, seeking a declaratory judgment as to whether the Snohomish County Council complied with statutory requirements in approving Olympic's amendment, and whether the amendment affected its right to serve Point Wells. Ronald also sought a declaratory judgment as to whether its corporate boundary includes Point Wells. Ronald then filed a motion for partial summary judgment, seeking a declaratory judgment that (1) the Transfer Order annexed Point Wells to Ronald as of January 1, 1986, (2) the Transfer Order was binding on Snohomish County, Olympic, Woodway, and Edmonds as of January 1, 1986, and (3) RCW 57.02.001 validated and ratified Ronald's annexation of Point Wells, regardless of any defects in the Transfer Order.[13]

Woodway and Snohomish County then filed cross motions for summary judgment. In their motions, Woodway and Snohomish County sought a declaratory judgment that Ronald's corporate boundary does not extend into Snohomish

---

[13] Ronald did not refer to KCSD No. 3's contract with Briggs, or the Briggs property, in its motion. And, a map it provided in its motion showed the "Point Wells Service Area" as an area separate from, and immediately west of, Woodway. But, in describing Point Wells at the hearing on its motion, Ronald included the portion of Woodway where the Briggs property is located. Thus, Ronald argued at the hearing, but not in its motion, that the Transfer Order also annexed the area where the Briggs property is located.

County.[14] Olympic filed a memorandum in opposition to Ronald's motion, and in support of Woodway and Snohomish County's cross motions.

The trial court granted Ronald's motion for partial summary judgment and denied Woodway and Snohomish County's motions. It found that (1) the Transfer Order annexed the "Point Wells Service Area" to Ronald, (2) the Transfer Order was a judgment in rem, binding against the Snohomish County defendants, and (3) RCW 57.02.001 validated and ratified Ronald's annexation of Point Wells, rendering moot any defect in the Transfer Order. It defined the "Point Wells Service Area" as the area described in addendum A to the transfer agreement, Point Wells and the Briggs property in Woodway. Olympic and Woodway appeal.[15]

## DISCUSSION

Ronald claims to have annexed into its corporate boundaries in 1986 an area within Snohomish County that at all times prior had been within Olympic. The area was never within the boundaries of KCSD No. 3. It was never within the boundaries of King County. Annexation of territory between two sewer districts

---

[14] Woodway also argued that (1) Ronald has no exclusive right to provide sewer service in Point Wells, (2) Ronald is not entitled to a declaration regarding the legality of Olympic's amendment to its sewer plan or the amendment's effect on Ronald's service right, and (3) there is no factual or legal basis for Ronald's requested injunctive relief. Woodway does not address these additional arguments on appeal. Accordingly, we do not address them.

[15] Prior to the State Supreme Court transferring the case to this court, Olympic filed a motion to include extra-record materials in the appendix to its brief, and King County filed a motion to include additional evidence on review. The motions were transferred to this court. Olympic's additional evidence includes topographical maps and a depiction of the proposed development of Point Wells. King County's additional evidence includes flow swap agreements made between Edmonds and the Municipality of Metropolitan Seattle, and Edmonds and King County. Because the additional evidence in each motion is not necessary to resolve this case, we deny the motions.

12

was governed by the withdrawal and annexation procedures in former chapters 56.24 and 56.28 RCW.[16] No withdrawal or annexation under those chapters was undertaken here.

Ronald's claim relies on 1984 legislation codified at former RCW 36.94.410-.440. It applies only when a county is transferring a sewer system it operates to a sewer district. Former RCW 36.94.410 (1984). If the transfer agreement so provides, the sewer district acquiring the county's sewer system shall be deemed to have annexed the area served by the county system, upon court approval. RCW 36.94.440; former RCW 36.94.420 (1985). The agreement between King County and Ronald described its area served as including Point Wells and the Briggs properties and provided for Ronald to annex.

The annexation of the portion of the sewer district within the boundaries of King County is not in dispute. Nor is the transfer of the contracts by which King

_____

[16] At the time of the Transfer Order in 1986, there was no provision in former Title 56 RCW providing for the direct transfer of territory between two sewer districts. Rather, the residents or commissioners of one sewer district would obtain approval from the county legislative authority to withdraw certain territory, or, if the petition for withdrawal was denied, a special election would be held. See former RCW 56.28.010 (1953) (allowing territory to be withdrawn in same manner as withdrawal of territory from water districts); former RCW 57.28.020 (1982) (allowing residents to petition); former RCW 57.28.035 (1985) (allowing sewer district commissioners to commence withdrawal); former RCW 57.28.080 (1941) (providing for hearing before county legislative authority); former RCW 57.28.090 (1982) (providing for special election if petition is denied). Then, annexation of withdrawn territory by another sewer district required approval by the county legislative authority, a special election within the territory proposed to be annexed, and notice to the boundary review board. See former RCW 36.93.090(1)(a) (1985) (requiring that, for any proposed change to the boundary of a special purpose district, the initiators of the action file notice with the boundary review board); former RCW 56.24.080 (1985) (requiring approval by county legislative authority and special election).

County provided services to the property in Snohomish County. Only the annexation of the area within Olympic is at issue.

At the heart of this dispute is the meaning of the words "area served by the system" used in RCW 36.94.420. Did the legislature intend for a county to transfer and a sewer district to annex these areas served by contract, outside the boundaries of the transferring county and within the boundaries of a sewer district not party to the transfer?

## I. Transfer and Court Proceedings

Olympic and Woodway argue that the Transfer Order relied on RCW 36.94.410-.440, and that the statutes never authorized the county to transfer or Ronald to annex any area outside of King County's borders. They contend that annexation is an action authorized by the legislature and ordinarily conducted with a vote of the people. Thus, they assert that the only way a superior court could have subject matter jurisdiction to order an annexation would be if the legislature provided it. They argue that the legislature limited annexations under RCW 36.94.410-.440 to the territory within the transferor county's borders. Therefore, they argue that the Transfer Order, which purports to annex Snohomish County territory, is void because the King County Superior Court lacked subject matter jurisdiction.

Conversely, Ronald argues that RCW 36.94.410-.440 did not limit transfers between a county and a municipal corporation to the territory within the transferor county's borders. And, even if the statutes contained such a limitation, it asserts

that the King County Superior Court's failure to comply with the statute did not affect its subject matter jurisdiction.

The trial court granted summary judgment that the Transfer Order lawfully annexed Point Wells to Ronald's corporate boundary. This court reviews summary judgment orders de novo, considering the evidence and all reasonable inferences from the evidence in the light most favorable to the nonmoving party. Keck v. Collins, 184 Wn.2d 358, 370, 357 P.3d 1080 (2015). Summary judgment is appropriate only when no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law. Id.

## II. Statutory Interpretation

Olympic and Woodway argue first that the Transfer Order was not legally authorized by RCW 36.94.410-.440. Specifically, they assert that RCW 36.94.410-.440 did not authorize any annexation outside of King County's borders.

### A. Standard of Review

Statutory interpretation questions are questions of law that we review de novo. Dot Foods, Inc. v. Dep't of Revenue, 166 Wn.2d 912, 919, 215 P.3d 185 (2009). The court's primary duty in interpreting the statute is to ascertain and carry out the legislature's intent. Lake v. Woodcreek Homeowners Ass'n, 169 Wn.2d 516, 526, 243 P.3d 1283 (2010). Statutory interpretation begins with the statute's plain meaning. Id. "The 'plain meaning' of a statutory provision is to be discerned from the ordinary meaning of the language at issue, the context of the statute in which that provision is found, related provisions, and the statutory scheme as a whole." State v. Engel, 166 Wn.2d 572, 578, 210 P.3d 1007 (2009). We avoid a

reading that produces absurd results, because we presume the legislature does not intend them. Id. at 579. When the plain language is unambiguous, the legislative intent is apparent and we will not construe the statute otherwise. State v. J.P., 149 Wn.2d 444, 450, 69 P.3d 318 (2003).

B. Context of Statutory Scheme

The legislature did not define the phrase "area served" in former RCW 36.94.420. See former RCW 36.94.010 (1981). Olympic and Woodway contend that "area served" is limited to the area served within the transferor county's borders, and does not include area served by contract outside its borders. Ronald disputes that this is the correct interpretation of "area served." It argues that the statute does not limit annexations to territory within the transferor county. Accordingly, we must determine whether, under the plain language of RCW 36.94.420, "area served" means the area only within the transferor county's borders, or includes areas outside the county that it serves by contract.

In 1985, sewer districts like Ronald and Olympic were governed by former Title 56 RCW. Former chapter 56.04 RCW governed their formation. To form or reorganize a sewer district, 25 percent of qualified electors residing within the proposed district had to present a petition to the board of county commissioners of the county in which the proposed sewer district was located.[17] Former RCW

---

[17] If the boundaries or proposed boundaries of a sewer district included more than one county,

> all duties delegated by Title 56 RCW to officers of the county in which the district is located shall be delegated to the officers of the county in which the largest land area of the district is located, except that elections shall be conducted pursuant to [former] RCW 56.02.050

16

56.04.030 (LAWS OF 1945, ch. 140, § 2). The statutory provisions then required a hearing process before the board of county commissioners, and a special election. See former RCW 56.04.040 (1945); former RCW 56.04.050 (LAWS OF 1973 1st Ex. Sess., ch. 195, § 61). The process is purely legislative.

Since 1941, the legislature has prohibited the geographical overlapping of sewer districts. See LAWS OF 1941, ch. 210, § 5. Under former RCW 56.04.070 (1985), if two or more petitions for the formation of a sewer district were filed, the petition describing the greater area superseded all others. And, no lesser sewer district could be "created within the limits in whole or in part of any other sewer district, except as provided in RCW 56.36.060 and 36.94.420."[18] Id.

This prohibition against overlapping special purpose districts is evident in Alderwood Water District v. Pope & Talbot, Inc., 62 Wn.2d 319, 382 P.2d 639 (1963). There, the Washington State Supreme Court considered whether one water district could directly furnish water to the inhabitants located outside the boundaries of that district and within the boundaries of another water district. Id.

---

[(1971)], actions subject to review and approval under [former] RCW 56.02.060 [(1971)] and 56.02.070 [(1971)] shall be reviewed and approved by only the officers or boards in the county in which such actions are proposed to occur, verification of electors' signatures shall be conducted by the county election officer of the county in which such signators reside, and comprehensive plan review and approval or rejection by the respective county legislative authorities under [former] RCW 56.08.020 [(1982)] shall be limited to that part of such plans within the respective counties.

Former RCW 56.02.055 (1982).

[18] The same rule applied to water districts. Former RCW 57.04.070 (1985) ("[N]o lesser water district shall ever be created within the limits in whole or in part of any water district, except as provided in [former] RCW 57.40.150 [(1981)] and [former RCW] 36.94.420 [(1985)].").

17

at 320. The court concluded that the legislative purpose in permitting water districts to supply water to individuals outside their districts "was meant to extend water services only to those individuals who were not within the boundaries of any other water district." Id. at 323.

In doing so, the court noted that, under former RCW 57.04.070 (1929), whenever two or more petitions for the formation of a water district are filed, the petition describing the greater area shall supersede all others. Id. at 321-22. And, no lesser water district shall ever be created within the limits in whole or in part of any water district. Id. It determined that "[t]his statutory prohibition against the geographical overlapping of water districts obviously carries with it an implication that one water district should not infringe upon the territorial jurisdiction of another water district by extending services to individuals therein." Id. at 322. It also observed, "If a water district refuses to serve a property owner whose premises are located within the district . . . an opportunity for relief is available to the property owner, pursuant to [chapter] 57.28[ RCW], through a procedure for the withdrawal of territory from the district." Id. at 323. Former chapter 56.28 RCW contains a similar procedure to withdraw from a sewer district. See RCW 56.28.010 (1953).

Former RCW 56.08.060 (1981) also gave sewer districts the authority to "provide sewer service to property owners in areas within or without the limits of the district." But, as of 1981, if any such area was located within another existing district authorized to exercise sewer district powers in that area, service could not be provided "without the consent by resolution of the board of commissioners of

such other district."[19] LAWS OF 1981, ch. 45, § 4. Clearly, no sewer district had a right to unilaterally extend service into the territory of another sewer district.

Former chapters 56.24 and 56.28 RCW governed the annexation of territory between two sewer districts.[20] First, residents within a sewer district had to file a petition to withdraw that territory from the district with the county election officer in each county where the district is located.[21] See former RCW 56.28.010 (1953) (allowing territory to be withdrawn in same manner as withdrawal of territory from water districts); former RCW 57.28.020 (1982) (allowing residents to petition). Hearings would then occur before the sewer district commissioners and county legislative authority in each county where the district is located. See former RCW 56.28.010 (allowing territory to be withdrawn in same manner as withdrawal of territory from water districts); former RCW 57.28.050 (1941) (hearing before sewer district commissioners); former RCW 57.28.080 (1941) (hearing before county

---

[19] The same rule applied to water districts. See former RCW 57.08.045 (1981) (providing that a water district may not extend water services into another existing district authorized to exercise water district powers in that area "without the consent by resolution of the board of commissioners of such other district").

[20] Former chapter 57.24 RCW governed the annexation of territory by water districts. The chapter provided for similar petition, hearing, and election procedures. See former RCW 57.24.010 (1982); former RCW 57.24.020 (1982); former RCW 57.24.040 (1929).

[21] If there were no qualified electors residing in the territory to be withdrawn, the landowners of the majority of the acreage of that territory could file a petition for withdrawal with the sewer district commissioners. See former RCW 56.28.010 (allowing territory to be withdrawn in same manner as withdrawal of territory from water districts); former RCW 57.28.030 (1941) (allowing landowners to petition). Alternatively, the board of commissioners of a sewer district could commence the withdrawal of certain territory within that district by resolution. Former RCW 57.28.035.

legislative authority). A special election to determine the withdrawal would be held if the petition was denied. Former RCW 57.28.090 (1982).

Next, like the formation process, annexation of territory adjoining or in close proximity to a district had to be initiated by 20 percent of registered voters residing in the territory filing a petition with the sewer district commissioners. Former RCW 56.24.070 (1985). If there were no electors residing in the territory, the petition could instead be signed by the owners of a majority of the acreage in the territory. Id. The statutory provisions then required a hearing process before the county legislative authority, and a special election.[22] See former RCW 56.24.080 (1985); former RCW 56.24.090 (1967).

When the Transfer Order took effect in 1986, former RCW 56.02.060 (1971) provided that, "[n]otwithstanding any provision of law to the contrary, no sewer district shall be formed or reorganized under chapter 56.04 RCW, nor shall any sewer district annex territory under chapter 56.24 RCW . . . unless such proposed action shall be approved as provided for in [former ]RCW 56.02.070[ (1971)]." If the proposed annexation were to take place in a county without a boundary review board, the county legislative authority had to approve the action. Former RCW 56.02.070 (1971). If the proposed annexation were to take place in a county with

_____

[22] The legislature also provided for an alternative petition method for "annexation of an area contiguous to a sewer district." Former RCW 56.24.120 (1985). The petition had to be filed with the board of the sewer district commissioners, and signed by the owners of at least 60 percent of the area of land for which annexation was petitioned. Id. The statutory provisions then required a hearing process before the board of commissioners, after which the board would determine by resolution whether to annex the land. See RCW 56.24.130 (1967); RCW 56.24.140 (1967).

a boundary review board, notice of intention of the proposed action had to be filed with the board, and a copy had to be filed with the legislative authority. Id. If the county legislative authority approved the proposed action, such approval was final. Id. If it did not, the board would review the action. Id. The board's decision superseded approval or disapproval by the county legislative authority. Id. There was no role for a superior court in this process. Clearly, no sewer district had a statutory right to unilaterally annex a portion of another sewer district.

Former chapter 36.94 RCW governs a county's operation of its sewerage, water and drainage systems. It provides that "[t]he construction, operation, and maintenance of a system of sewerage and/or water is a county purpose." Former RCW 36.94.020. Every county, either individually or in conjunction with another county, has the power to "adopt, provide for, accept, establish, condemn, purchase, construct, add to, and maintain a system or systems of sanitary and storm sewers, including outfalls, interceptors, plans, and facilities necessary for sewerage treatment and disposal . . . within all or a portion of the county." Id. (emphasis added). Counties may also contract to do things outside their borders:

> Every county in furtherance of the powers granted by this chapter shall be authorized to contract with the federal government, the state of Washington, or any city or town, within or without the county, and with any other county, and with any municipal corporation created under the laws of the state of Washington and not limited as defined in [former ]RCW 36.94.010[ (1981)], or political subdivision, and with any person, firm or corporation in and for the establishment, maintenance and operation of all or a portion of a system or systems of sewerage and/or water supply.

RCW 36.94.190.

Former Title 36 RCW provides different procedures for the transfer of sewerage systems and annexation of territory by sewer districts, where one of the parties to the transfer is a county. See RCW 36.94.310; former RCW 36.94.410-.420. The approval of any annexation by a sewer district is before the superior court, rather than county commissioners and voters. RCW 36.94.440.

RCW 36.94.310 provides that a municipal corporation may transfer to a county "within which all of its territory lies" all or part of the property constituting its system of sewerage. Since a county already had statutory authority to provide sewer service county-wide, the statutes governing this type of transfer, RCW 36.94.310-.340, do not include any annexation provisions nor implicate boundary review. See former RCW 36.94.020 ("[E]very county has the power [to] maintain a system of sanitary and storm sewers . . . within all or a portion of the county.").

Under former RCW 36.94.410, a county's water or sewerage system may be transferred from that county to a water or sewer district "in the same manner as is provided for the transfer of those functions from a water or sewer district to a county in RCW 36.94.310 through 36.94.340." Under former RCW 36.94.420, if provided in the transfer agreement, "the area served by the system shall, upon completion of the transfer, be deemed annexed to and become a part of the water or sewer district acquiring the system." In contrast to annexations under former Title 56, annexations by a sewer district under former RCW 36.94.410-.440 are not subject to review by a boundary review board. Former RCW 36.93.105 (1984).

In 1967, the legislature authorized the creation of boundary review boards by a county. LAWS OF 1967, ch. 189, § 3. In describing the purpose of boundary review boards, it noted,

> [T]he competition among municipalities for unincorporated territory and the disorganizing effect thereof on land use, the preservation of property values and the desired objective of a consistent comprehensive land use plan for populated areas, makes it appropriate that the legislature provide a method of guiding and controlling the creation and growth of municipalities in metropolitan areas so that such problems may be avoided.

Id. at § 1. Former RCW 36.93.090(1)(a) (1985) required that, for any proposed change to the boundary of a special purpose district, the initiators of the action file a notice of intention of the action with the board. In defining a "special purpose district," the legislature included sewer districts. Former RCW 36.93.020 (1979). It also required that the initiators of an action to permanently extend sewer service outside the boundaries of a sewer district file a notice of intention of the action with the board. Former RCW 36.93.090(5).

Annexation addresses boundaries of municipal districts. No sewer district is authorized to provide sewer service within another district without that district's consent. The statutory scheme for sewer districts is clearly intended to avoid overlapping boundaries of sewer districts. Both former Title 56 RCW, which governed sewer districts, and chapter 36.93 RCW, which governs boundary review of such special districts, protect the ability of sewer districts to provide sewer services within their corporate boundaries. See former RCW 36.93.090(3)-(4); former RCW 56.04.070 (providing that no lesser sewer district shall be created within the limits in whole or in part of any other sewer district); former RCW

23

56.08.060 (providing that a sewer district shall not provide sewer services within another existing district authorized to exercise sewer district powers without the consent by resolution of the board of commissioners of such other district).

### C. Plain Meaning of Area Served

The result Ronald seeks is an annexation of territory from Olympic, without Olympic's involvement, let alone consent. The basis of its claim is that the transfer agreement with King County provided for the annexation. But, the area to be annexed was not within King County's boundaries. It would be unreasonable to read the statute as authorizing King County to transfer territory, within another special purpose district, within another county, as part of its divestment of its own sewer system.

Had the legislature been aware of the conflict between RCW 36.94.410-.440 and former Title 56 RCW, and had it intended the result Ronald seeks, it would surely have written an explicit exemption from the conflicting provisions in former Title 56 RCW. No such exemption or even cross-reference appears in RCW 36.94.410-.440. Former Title 56 RCW does not allow a hostile annexation by one sewer district against another. It prohibits a sewer district from providing sewer service within another district authorized to exercise sewer district powers, unless that district consents. Former RCW 56.08.060. The reasonable inference from the language in the statutes is that the legislature did not anticipate that RCW 36.94.410-.440 conflicted with former Title 56 RCW, did not intend to exempt the transaction from former Title 56 RCW, and did not intend the result Ronald seeks.

24

The exemption from boundary review board review in SHB 1127 is also consistent with a legislative expectation that no boundary issues are implicated. If the legislature intended for the area being annexed by a sewer district to be solely within the boundaries of the county making the transfer, then no boundary issues with other districts are implicated. Review would serve no purpose. However, if the legislature was aware that the area being annexed could be outside the boundaries of the transferring county, it would be aware of a potential conflict with the boundaries of other districts and the resulting conflict between SHB 1127 and former Title 56 RCW. If the legislature had anticipate this scenario, it would have addressed the conflict between these statutes.

But, because SHB 1127 contained no exemption from former Title 56 RCW to eliminate the conflict between the two statutes, former RCW 56.02.060 would apply to the conflicting claims of Ronald and Olympic. Thus, the statute would control over the boundary review board exemption for transfers under RCW 36.94.410-.440. Former RCW 56.02.060 provides, "Notwithstanding any provision of law to the contrary, no sewer district shall be formed or reorganized under [former ]chapter 56.04 RCW, nor shall any sewer district annex territory under [former ]chapter 56.24 RCW . . . unless such proposed action shall be approved as provided for in [former ]RCW 56.02.070." (Emphasis added.) Former RCW 56.02.070 required boundary review board approval.[23]

---

[23] For counties without a boundary review board, former RCW 56.02.070 required approval by the county legislative authority.

The result is that no boundary review board review would occur as to transfer of the portion of the sewerage system within the county's boundaries, but would occur as to transfer of any portion of the sewer system outside the county boundaries within another sewer district. It is unreasonable to believe that the legislature exempted an RCW 36.94.410-.440 transaction from boundary review board review, without qualification, if it anticipated any boundary issues with a sewer district not a party to the county transfer.[24]

Both former Title 56 RCW and chapter 36.93 RCW protect the authority of municipal corporations to provide services within their corporate boundaries. Accordingly, we conclude that no boundary conflicts with a third party district were anticipated when RCW 36.94.410-.440 was enacted, no exemption from former Title 56 RCW was stated, and none can be inferred.

It is clear from the context and the 1986 statutory scheme as a whole that the plain meaning of "area served" for purposes of annexation means only the area

---

[24] For the first time in 1995, the legislature included and defined the word "service area" in this statute. LAWS OF 1995, ch. 131, § 1. It stated that, for extensions of sewer services outside of a special purpose district's service area, "service area" includes "the area outside of the corporate boundaries which it is designated to serve pursuant to a comprehensive sewerage plan approved in accordance with chapter 36.94 RCW and RCW 90.48.110." LAWS OF 1995, ch. 131, § 1. A permanent extension of this area was subject to review by a boundary review board. Id. "It is a well-recognized rule of statutory construction that 'where a law is amended and a material change is made in the wording, it is presumed that the legislature intended a change in the law.'" Guillen v. Pierce County, 144 Wn.2d 696, 723, 31 P.3d 628, 34 P.3d 1218 (2001) (quoting Home Indem. Co. v. McClellan Motors, Inc., 77 Wn.2d 1, 3, 459 P.2d 389 (1969)), rev'd in part on other grounds, 537 U.S. 129, 123 S. Ct. 720, 154 L. Ed. 2d 610 (2003). Accordingly, this change should be construed such that, prior to the legislature defining "service area" to include area outside of a district's corporate boundaries, a district's service area did not include area outside of its corporate boundaries.

of the sewer system within the boundaries of the county making the transfer. It does not include the area outside its borders, served by contract, and within the corporate boundaries of another municipal corporation with sewer district powers.

III. Subject Matter Jurisdiction

The transfer agreement between King County and Ronald provided that "[t]he area served by the System shall be deemed annexed to and a part of the District as of" January 1, 1986. In an addendum describing the "'area served,'" King County and Ronald included Snohomish County territory. That territory included Point Wells, and the area in Woodway where Briggs's property is located.

Point Wells and the area in Woodway where Briggs's property is located were never within King County or KCSD No. 3's boundaries. Thus, after KCSD No. 3 transferred the RBSS to King County, King County acquired no right to provide service in Snohomish County beyond that in its contracts with Standard and Briggs. Yet, in the Transfer Order, King County purported to transfer and allow Ronald to annex this territory by including it in the legal description of its service area.

The Transfer Order stated, "As provided in the transfer agreement, the area served by the System shall be annexed to and become a part of the District." Thus, in directing that Snohomish County territory be annexed to Ronald, the King County Superior Court directed an annexation that was not legally authorized by RCW 36.94.410-.440. Under the plain meaning of "area served" in former RCW 36.94.420, Ronald could annex only the area served within King County's borders. It was not permitted to annex Snohomish County territory within Olympic's

27

boundaries that King County served by contract. Accordingly, the King County Superior Court committed legal error in directing that Snohomish County territory be annexed to Ronald.

Ronald contends that, even if the King County Superior Court lacked statutory authority to enter the Transfer Order, the order is not void because the court had subject matter jurisdiction. Where a court has personal and subject matter jurisdiction, a procedural irregularity renders a judgment voidable, not void. In re Marriage of Mu Chai, 122 Wn. App. 247, 254, 93 P.3d 936 (2004). Ronald argues further that estoppel, laches, and acquiescence bar Olympic and Woodway from seeking relief from the order. Olympic and Woodway argue that the King County Superior Court lacked subject matter jurisdiction over the "cross-border annexation." To the extent that King County asked the court to approve Ronald's annexation of territory in Snohomish County, they contend that the action was void.

A court order is void only if there is a defect in subject matter or personal jurisdiction. Trinity Universal Ins. Co. of Kan. v. Ohio Cas. Ins. Co., 176 Wn. App. 185, 198, 312 P.3d 976 (2013). Jurisdiction is the "'power and authority of the court to act.'" Dougherty v. Dep't of Labor & Indus., 150 Wn.2d 310, 315, 76 P.3d 1183 (2003) (quoting 77 AM. JUR. 2D Venue § 1 at 608 (1997)). "The critical concept in determining whether a court has subject matter jurisdiction is the 'type of controversy.'" Id. at 316 (quoting Marley v. Dep't of Labor & Indus., 125 Wn.2d 533, 539, 886 P.2d 189 (1994)). If the type of controversy is within the court's subject matter jurisdiction, then all other defects or errors go to something else. Id. In light of the state constitution's broad grant of subject matter jurisdiction to

the superior court, "we may find a lack of subject matter jurisdiction only under compelling circumstances, such as when it is explicitly limited by the legislature or Congress." Hous. Auth. v. Bin, 163 Wn. App. 367, 375, 260 P.3d 900 (2011).

The state constitution does not grant superior courts the power of annexation. See WASH. CONST. art. IV, § 6. Rather, the legislature "enjoys plenary power to adjust the boundaries of municipal corporations and may authorize annexation without the consent of the residents and even over their express protest." Grant County Fire Prot. Dist. No. 5 v. City of Moses Lake, 150 Wn.2d 791, 813, 83 P.3d 419 (2004). While the State may delegate its annexation power and prescribe the mode, method, and conditions under which the delegated authority may be exercised, the ultimate power of annexation rests exclusively in the State. Id.

When the Transfer Order took effect in 1986, the legislative scheme for sewer district formation was governed by former chapter 56.24 RCW. Annexation of territory by a sewer district was to be accomplished through a hearing and election process. Former RCW 56.24. 080. It required county legislative authority and voter approval of the annexation. See former RCW 56.24.080 (requiring county legislative authority to approve petition); former RCW 56.24.090 (requiring special election). Superior courts had no role in these procedures.

In 1984, the legislature granted superior courts narrow jurisdiction to approve the annexation of territory by a sewer district. See RCW 36.94.440; former RCW 36.94.410; former RCW 36.94.420. That authority was limited to transactions in which a county was transferring by agreement a water or sewerage

29

system it operated to a water or sewer district. <u>See</u> former RCW 36.94.410. In that two party transaction, approval was vested in the superior court, rather than the county legislative authority and voters within the territory to be annexed. <u>See</u> RCW 36.94.440.

Under those procedures, if a superior court finds that an agreement to transfer a county's water or sewerage system to a water or sewer district "is legally correct and that the interests of the owners of related indebtedness are protected," then the court "shall direct that the transfer be accomplished in accordance with the agreement." Former RCW 36.94.440. If provided in the transfer agreement between the county and the water or sewer district, "the area served by the system shall, upon completion of the transfer, be deemed annexed to and become a part of the . . . sewer district acquiring the system." Former RCW 36.94.420. As established above, "area served" means only the area within the borders of the county making the transfer.

A county could not transfer what it did not have. King County did not have a statutory right to provide sewer service in Snohomish County. Thus, pursuant to the transfer agreement, Ronald could annex only King County territory from King County, not Snohomish County territory from Olympic.

Point Wells and the Briggs properties were within Olympic's corporate boundaries at the time of the Transfer Order. Olympic was not a party to King County and Ronald's transfer agreement or petition to approve the agreement. Any potential annexation and boundary adjustment between Ronald and Olympic

30

was controlled by former Title 56 RCW, not by Title 36 RCW, and superior courts lacked jurisdiction over annexation under former Title 56 RCW.

By enacting former RCW 36.94.410-.440, the legislature did not give superior courts general jurisdiction to approve annexations. It did not grant to superior courts jurisdiction to allow a sewer district to annex territory from another municipal corporation not party to a transfer agreement under chapter 36.94 RCW and contrary to former Title 56 RCW. Rather, it gave superior courts only narrow jurisdiction to approve the annexation of territory within a county by a sewer district, based on an agreement to transfer a sewerage system from that county to the sewer district. See former 36.94.410; 36.94.420; 36.94.440. Thus, the King County Superior Court lacked subject matter jurisdiction to approve an annexation of any area within Olympic by Ronald.

Accordingly, to the extent that the Transfer Order purports to authorize Ronald's annexation of area within Snohomish County and within Olympic, the order is void.[25] Ronald's corporate boundaries do not extend into Snohomish County.

---

[25] Because we conclude that the Transfer Order is void due to a lack of subject matter jurisdiction, we do not reach Ronald's arguments regarding estoppel, laches, and acquiescence, or Olympic's remaining arguments that would apply only to a voidable order. A court has a nondiscretionary duty to vacate a void judgment. Allstate Ins. Co. v. Khani, 75 Wn. App. 317, 323, 877 P.2d 724 (1994). Void judgments may be vacated regardless of the lapse of time; not even laches bars a party from attacking a void judgment. Id. at 323-24. And, unlike personal jurisdiction, a party cannot waive subject matter jurisdiction. Sullivan v. Purvis, 90 Wn. App. 456, 460, 966 P.2d 912 (1998).

31

IV. RCW 57.02.001

Ronald argues that enactment of RCW 57.02.001 validated its annexation of Point Wells, "rendering moot any technical defect in the 1985 Annexation Order." (Boldface omitted.)

RCW 57.02.001 provides:

> Every sewer district and every water district previously created shall be reclassified and shall become a water-sewer district, and shall be known as the ". . . . . Water-Sewer District," or "Water-Sewer District No. . . . . . ." or shall continue to be known as a "sewer district" or a "water district," with the existing name or number inserted, as appropriate. As used in this title, "district" means a water-sewer district, a sewer district, or a water district. All debts, contracts, and obligations previously made or incurred by or in favor of any water district or sewer district, and all bonds or other obligations issued or executed by those districts, and all assessments or levies, and all other things and proceedings done or taken by those districts or by their respective officers, are declared legal and valid and of full force and effect.

Ronald asserts that the broad language validating "'all acts' . . . clearly encompasses Ronald's annexation of the Point Wells Service Area."

In 1996, the legislature eliminated distinct water and sewer districts and created combined water-sewer districts, all under a revised Title 57 RCW. Landmark Dev., Inc. v. City of Roy, 138 Wn.2d 561, 570 n.1, 980 P.2d 1234 (1999). RCW 57.02.001 provides that each water and sewer district be reclassified as a water-sewer district. In this context, it is clear that the legislature intended to ensure that the previous valid actions of the municipal corporations were not called into question by virtue of the reclassification, renaming or amended statutory authority. The statutory language does not legalize invalid or illegal actions nor insulate the districts from then existing claims. To infer such an intention would be

32

absurd, and we presume that the legislature does not intend absurd results. See Engel, 166 Wn.2d at 579.

Moreover, the lack of subject matter jurisdiction over the type of annexation King County and Ronald proposed was not a technical defect in the Transfer Order. It was a fatal defect. Nothing in this statute remedies the lack of subject matter jurisdiction in the superior court to approve the annexation. Accordingly, to the extent that the Transfer Order purports to authorize Ronald's annexation of Snohomish County territory, RCW 57.02.001 does not render that annexation valid.

We reverse the trial court's grant of partial summary judgment to Ronald, remand for an order granting Woodway's motion for summary judgment in part, and for other proceedings consistent with this opinion.[26]

WE CONCUR:

---

[26] Specifically, we order that Woodway be granted summary judgment as to its argument for a declaration that, based on the Transfer Order, Ronald's corporate boundary does not extend into Snohomish County.